

**FILED**

Feb 24 2016, 8:09 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Cynthia L. Ploughe
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Billy Luke, | February 24, 2016 |
| *Appellant-Defendant*, | Court of Appeals Case No. 15A01-1409-CR-407 |
| v. | Appeal from the Dearborn Superior Court |
| State of Indiana, | The Honorable Sally A. Blankenship, Judge |
| *Appellee-Plaintiff*. | Trial Court Cause Nos. 15D02-1401-FD-11 15D02-1307-CM-564 |
| | Appeal from the Dearborn Circuit Court |
| | The Honorable James D. Humphrey, Judge |
| | Trial Court Cause No. 15C01-1402-FC-19 |

**Brown, Judge.**

[1] In this consolidated appeal,[1] Billy Luke appeals his convictions for three counts of invasion of privacy as class D felonies and stalking as a class C felony, as well as the revocation of his probation. Luke raises seven issues which we consolidate, revise, and restate as:

I. Whether his convictions for invasion of privacy and stalking violate double jeopardy principles;

II. Whether the trial court abused its discretion in admitting evidence of other bad acts;

III. Whether the evidence is sufficient to sustain his convictions for invasion of privacy;

IV. Whether the court abused its discretion in instructing the jury; and

V. Whether the evidence is sufficient to revoke his probation.[2]

We affirm in part, reverse in part, and remand.

---

[1] The record contains a transcript and an appendix from both the Dearborn Superior Court and the Dearborn Circuit Court. References to the record from the Dearborn Superior Court will be to the "Superior Appendix" and the "Superior Transcript." References to the record from the Dearborn Circuit Court will be to the "Circuit Appendix" and the "Circuit Transcript."

[2] Luke further raises the issue of whether the prosecution for stalking was barred by Ind. Code § 35-41-4-4(a), which prohibits successive prosecutions. However, because we reverse Luke's stalking conviction based upon double jeopardy principles, we need not address this argument.

## Background and Procedural History

Luke resided at his grandmother's house in Dillsboro, Indiana. Deville's Pharmacy (the "Pharmacy") is located across the street, and the employee parking lot is adjacent to and less than ten feet from the house's driveway.

On August 3, 2012, under Cause Number 15D01-1202-CM-111 ("Cause No. 111") in the Dearborn County Superior Court 1, Luke was found guilty of four counts of public indecency as class A misdemeanors following a trial for various acts of standing at a window inside his residence, exposing his penis, and masturbating in view of Pharmacy female employees, named T.R., R.B., C.B., and K.R. He was sentenced to an aggregate term of 1,095 days, including 715 days suspended, and was placed on probation for 725 days. One of the conditions of probation was that "Defendant shall have no contact with [T.R., R.B., C.B., or K.R.[3]] in person, by telephone, mail, computer, or any other means at the victim's residence or place of employment." Superior Appendix at 155. The court issued no contact orders pertaining to R.B., T.R., and C.B. (collectively, the "No Contact Order"), each of which stated that contact "includes, but is not limited to, acts of harassment, stalking, intimidation, threats, and physical force of any kind." State's Superior Court Exhibits 11-13.

In May of 2013, while Luke was on probation and under the No Contact Order, the female Pharmacy employees began seeing him on a "daily basis" on

---

[3] The sentencing order contains the name of a fifth victim who is not a part of this consolidated appeal.

his porch and in his driveway while they were arriving at or leaving work. Circuit Transcript at 221. During that summer, Luke would wear a full dress suit and stand in his yard wearing dark sunglasses, which intimidated and frightened the employees, and the Pharmacy experienced a number of incidents of vandalism, including broken windows, a broken glass door, a broken window in an outbuilding, and a broken windshield on the Pharmacy's delivery van, in which marbles were used to break the glass. A truck belonging to T.R.'s boyfriend was vandalized with flattened tires and the words "[p]unk bitch" scratched into the truck's paint. *Id.* at 302. Luke later admitted committing these acts to a friend, Chase Merkel, in phone conversations in February 2014 which Merkel recorded. Luke, who was incarcerated at the time, asked Merkel to commit acts of vandalism, including shooting out the pharmacy windows with marbles, as well as to throw a sex toy into the Pharmacy and to pull his pants down and "pull [his] male genitalia out and swing it around like a helicopter" for the security cameras. *Id.* at 592.

[5] On July 18, 2013, Luke was charged in Dearborn Superior Court 2 under Cause Number 15D02-1307-CM-564 ("Cause No. 564") with attempted invasion of privacy as a class A misdemeanor. The probable cause affidavit alleged that on or about July 9, 2013, Dearborn County Sheriff's Deputy Charlie Olson, while investigating "several vandalism cases in Dillsboro," spoke with Chief of Dillsboro Police Ryan Brandt, and that Chief Brandt told him that Luke had recently presented him with a letter to give to the mother of T.R. and K.R., each of whom had a no contact order against Luke, explaining "who he was

and what had occurred during his conviction in his opinion." Superior Appendix at 11. Luke was subsequently arrested.

[6] On December 23, 2013, Luke was sentenced in another case, Cause Number 15D01-1308-FD-507 ("Cause No. 507"), in Dearborn Superior Court 1 pursuant to a plea agreement, to 365 days suspended to probation for a conviction for criminal mischief as a class A misdemeanor. As part of the agreement, the State dismissed a charge of voyeurism as a class D felony; Luke's probation under Cause. No. 111 was revoked, and he was ordered to serve 730 days of home detention with Southeast Regional Community Correction ("SERCC"). The court issued another no contact order regarding K.R., T.R., R.B., and C.B. On January 2, 2014, Luke appeared in Dearborn Superior Court 2 under Cause No. 564 and pled guilty to attempt to commit invasion of privacy as a class A misdemeanor, and he was sentenced to 365 days suspended to probation.

[7] Between January 3 and January 7, 2014, the Pharmacy employees again observed Luke outside the house and on the driveway staring at them at the Pharmacy. Luke was "always outside" despite the "freezing" weather. Superior Transcript at 212. On January 8, 2014, Officer Jack Prarat, an investigative commander for the Dearborn Sheriff's Department, visited the Pharmacy to pick up a prescription, and the employees complained to him about Luke's behavior despite the No Contact Order. Superior Transcript at 221. Officer Prarat approached Luke, and Luke stated that the police had already been to his house earlier in the week and told him not to be outside,

that he called his attorney about the matter who also told him not to be outside, and that "he was going to tell [Officer Prarat] the same thing he told the police earlier in the week[:] he was going to be outside and come summer he was going to be out even more and the girls at the pharmacy just needed to get used to it." *Id.* at 221-222.

[8] On January 10, 2014, the State charged Luke in Dearborn Superior Court 2 with three counts of invasion of privacy as class D felonies for violating the No Contact Order issued to protect R.B., T.R., and C.B. between January 3, 2014, and January 7, 2014, under Cause Number 15D02-1401-FD-11 ("Cause No. 11").[4] The same day, the State filed a request for probation violation hearing in Cause No. 564 due to these new charges.

[9] On February 24, 2014, the State filed a charging information under Cause Number 15C01-1402-FC-19 ("Cause No. 19") in the Dearborn Circuit Court which, as amended on August 14, 2014, charged Luke with stalking as a class C felony and eight counts of criminal mischief as class A misdemeanors. Count I, stalking, alleged that, between January 24, 2012, and February 19, 2014, Luke stalked C.B., R.B., T.R., and/or K.R. and that such stalking violated the No Contact Order under Cause No. 111.

---

[4] The charging information filed on January 10, 2014, alleged in each count that Luke violated the no contact order under Cause No. 507. On July 21, 2014, the court granted a motion to amend by the State and amended the charging information to allege that Luke violated the no contact order under Cause No. 111, i.e., the No Contact Order.

[10] On July 22, 2014, the Dearborn Superior Court 2 commenced a jury trial in Cause No. 11 on the invasion of privacy charges, and a jury found Luke guilty as charged on July 30, 2014. On July 31, 2014, the Dearborn Superior Court 2, under Cause No. 564, held a fact-finding hearing and entered an order revoking Luke's probation, finding that he violated his probation by committing the crimes of invasion of privacy under Cause No. 11. On August 15, 2014, the Dearborn Circuit Court commenced a jury trial in Cause No. 19, and on August 21, 2014, the jury found Luke guilty as charged.

[11] On August 25, 2014, the Dearborn Superior Court held a sentencing hearing in Cause Nos. 11 and 564. That same day, the Dearborn Circuit Court commenced a sentencing hearing in Cause No. 19. On August 29, 2014, in Cause No. 11, the Dearborn Superior Court sentenced Luke to an aggregate term of four years in the Department of Correction ("DOC").[5] In Cause No. 564, the court revoked his previously-suspended sentence. On September 18, 2014, the Dearborn Circuit Court resumed the sentencing hearing in Cause No. 19, and on September 29, 2014, sentenced Luke to eight years on Count I, stalking as a class C felony, and one year on each of Counts II-IX, the criminal mischief counts, to be served in the DOC. The court observed that, pursuant to Ind. Code § 35-50-1-2, it could sentence Luke to a maximum executed term of

---

[5] The court's initial sentencing order sentenced Luke to three years executed on Count I, three years executed on Count II, including two years concurrent with Count I and one year consecutive to Count I, and three years on Count III to be served concurrently with Counts I and II. On September 18, 2014, the court issued an amended sentencing order in which it sentenced Luke to three years on Count I, one year on Count II consecutive to Count I, and three years on Count III to be served concurrently with Counts I and II.

ten years, and accordingly it ordered that Counts I, II, and III be served consecutive to each other and that Counts IV-IX be served concurrent with Counts I-III and concurrent with each other, for an aggregate term of ten years in the DOC. The court also ordered that Luke's sentence be served consecutive to his sentence in Cause No. 11.

[12] Other facts relevant to the consideration of the issues will be provided below.

## *Discussion*

### I.

[13] The first issue is whether Luke's convictions for invasion of privacy and stalking violate double jeopardy principles. Luke argues that the State tried the stalking case in Cause No. 19 in such a manner that the evidence previously used to prove the charges of invasion of privacy in Cause No. 11 became factually included in the stalking conviction. He asserts that witnesses at his stalking trial, including the female victims and officers, testified at length regarding the incidents of early January 2014, and the State showed a video made from the pharmacy's surveillance camera system at both trials. He argues that Officer Prarat "repeated his testimony from [Cause No. 11] concerning a conversation Prarat had in [sic] Luke in January 2014," in which Luke told Prarat "he had the right to be outside his home and 'the girls at the pharmacy just needed to get used to it.'" Appellant's Brief at 18. He contends that the State relied on the same no contact orders at each trial, and that the addition of K.R. to the stalking case does not alleviate double jeopardy concerns.

[14] The State notes that, under Cause No. 11, Luke was tried and convicted of three counts of invasion of privacy for violating the no contact orders issued for R.B., T.R., and C.B., following Cause No. 507 during a discrete time period between January 3 and January 7, 2014. The State maintains that the stalking conviction under Cause No. 19 pertained to not only C.B., R.B., and T.R., but also K.R., and states that the no contact order discussed in that case was issued under Cause No. 111. The State asserts that the evidence presented to prove stalking included Luke's actions during the spring and summer of 2013, a letter Luke sent K.R. in July 2012, another letter Luke tried to relay to the mother of T.R. and K.R., and acts of vandalism in 2013, and states that "[t]he mere fact that some evidence appears in both trials does not meet the 'same evidence' test." Appellee's Brief at 14. In his reply brief, Luke argues that the State is incorrect in its assertion that the two trials concerned different no contact orders, noting that the original charging documents filed in Cause No. 11 were amended to delete reference to Cause No. 507 and substitute Cause No. 111, the No Contact Order stemming from the public indecency case, and that "[t]hus, Luke was on trial in both Circuit and Superior #2 for violating the same no contact order . . . ." Appellant's Reply Brief at 6.

[15] The Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense." IND. CONST. art. 1, § 14. "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Hopkins v. State*, 759 N.E.2d 633, 639 (Ind. 2001) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind.

1999)).  The Indiana Supreme Court has held that "two or more offenses are the 'same offense' in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense."  *Richardson*, 717 N.E.2d at 49.  "On appeal, the defendant bears the burden to show that his convictions violated his constitutional right to be free from double jeopardy."  *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002) (citing *Lutes v. State*, 272 Ind. 699, 401 N.E.2d 671, 672-673 (1980)).

[16]  In order to find a double jeopardy violation under the actual evidence test, a defendant must demonstrate and a reviewing court must conclude that there is a reasonable possibility that the evidentiary facts used by the factfinder to establish the essential elements of an offense for which the defendant was convicted or acquitted may also have been used to establish all the essential elements of a second challenged offense.  *Hines v. State*, 30 N.E.3d 1216, 1222 (Ind. 2015); *Vestal v. State*, 773 N.E.2d 805, 806 (Ind. 2002), *reh'g denied*.  "[A] 'reasonable possibility' that the jury used the same facts to reach two convictions requires substantially more than a logical possibility."  *Garrett v. State*, 992 N.E.2d 710, 719 (Ind. 2013) (quoting *Lee v. State*, 892 N.E.2d 1231, 1236 (Ind. 2008)).  The existence of a reasonable possibility turns on a practical assessment of whether the fact finder may have latched on to exactly the same facts for both convictions.  *Id.* at 720.  "Application of this test requires the court to 'identify the essential elements of each of the challenged crimes and to

evaluate the evidence from the jury's perspective . . . .'" *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (quoting *Spivey v. State*, 761 N.E.2d 831, 832 (Ind. 2002))). The Indiana Supreme Court has determined the possibility to be remote and speculative and therefore not reasonable when finding no sufficiently substantial likelihood that the fact-finder used the same evidentiary facts to establish the essential elements of two offenses. *Hopkins*, 759 N.E.2d at 640 (citing *Long v. State*, 743 N.E.2d 253, 261 (Ind. 2001), *reh'g denied*; *Redman v. State*, 743 N.E.2d 263, 268 (Ind. 2001)); *see also Griffin v. State*, 717 N.E.2d 73, 89 (Ind. 1999), *cert. denied*, 530 U.S. 1247, 120 S. Ct. 2697 (2000). "In determining the facts used by the fact-finder, 'it is appropriate to consider the charging information, jury instructions, [ ] arguments of counsel' and other factors that may have guided the jury's determination." *Hines*, 30 N.E.3d at 1222 (quoting *Lee*, 892 N.E.2d at 1234 (citing *Spivey*, 761 N.E.2d at 832, and *Richardson*, 717 N.E.2d at 54 n.48)).

[17] In Cause No. 11, the State alleged that "between January 3, 2014 and January 7, 2014 [Luke] did knowingly or intentionally violate a no contact order issued as a condition of probation . . . under [Cause No. 111]" to protect R.B., T.R., and C.B., and that such conduct was a class D felony because he had a prior unrelated conviction of attempted invasion of privacy under Cause No. 564. Superior Appendix at 425-426. At trial, in recognition of the fact that the No Contact Order specified that contact "includes, but is not limited to, acts of

harassment, stalking, intimidation, threats, and physical force of any kind,"[6] State's Superior Court Exhibits 11-13, the court instructed the jury on the term "harassment" in Final Jury Instruction No. 9 as follows:

> The term "harassment" is defined by law as meaning conduct directed toward a victim that includes but is not limited to repeated or continuing impermissible contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include statutorily or constitutionally protected activity, such as lawful picketing pursuant to labor disputes or lawful employer-related activities pursuant to labor disputes.

Superior Appendix at 489. This language is rooted in the definition of "harassment" found at Ind. Code § 35-45-10-2. Chapter 10 of Title 35, Article 45 of the Indiana Code is titled "stalking" and contains six sections relevant to prosecuting crimes of stalking.

[18] The State's case-in-chief at trial in Cause No. 11 focused on proving that Luke violated the No Contact Order (and therefore committed three counts of invasion of privacy) by harassing T.R., C.B., and R.B. between January 3 and January 7, 2014. C.B. testified that Luke had contact with her by being "outside when we would come to work and leave from work and then throughout the day he would be out there while we were in the store also." Superior Transcript at 182. She testified that Luke would stare at her, which

---

[6] At trial, the court read a stipulation to the jury highlighting that the No Contact Order contained such language.

made her feel "very uncomfortable" and "scared" her. *Id.* at 185. C.B. stated that, on those days in January 2014, Luke "stood out there and stared at [her] almost the entire time" she would be in the Pharmacy's parking lot. *Id.* at 189-190. During her testimony, a photograph she took of Luke outside his home was admitted into evidence. T.R. similarly testified that between January 3 and January 7, 2014, Luke "would stand in the driveway on the phone" which made her feel "[i]ntimidated and scary [sic]." *Id.* at 212. Officer Prarat testified that on January 8, 2014, after visiting the Pharmacy, he observed Luke "walking up and down his driveway" and that he walked over and spoke with him about the complaints from the women. *Id.* at 221. Officer Prarat testified that Luke responded by saying police had visited earlier in the week telling him not to be outside, that his attorney similarly told him not to be outside, and that "he was going to tell me the same thing he told the police earlier in the week, he was going to be outside and come summer he was going to be out even more and the girls at the pharmacy just needed to get used to it." *Id.* at 221-222.

[19] During the testimony of Officer Joshua Cady, the State presented video surveillance evidence depicting Luke outside the house and looking toward the Pharmacy. The State next called R.B. who testified that Luke "stood outside his house and stared us down pretty much the whole time we were at work," which made her feel "[v]ery concerned for [her] safety . . . . He looked like he was angry with us and just staring at us the whole time. We were worried that he would hurt us or one of our co-workers . . . ." *Id.* at 302. The court admitted certain other evidence under Ind. Evidence Rule 404 to show Luke's

intent to harass the female employees. Police Chief Brandt testified regarding the multiple incidents of vandalism, including to the Pharmacy, the police station, and the vehicle of T.R.'s boyfriend, which occurred in June of 2013. Deputy Prosecutor Jeff Sharp testified that on June 23, 2014, Luke handed him a letter Luke had written which stated in part: "I figured broken windows and flat tires would suffice as a humane wake up call." *Id.* at 390.

[20] This same evidence of harassment was used by the State in Cause No. 19 as a part of its broader case that Luke stalked T.R., K.R., R.B., and C.B. between January 24, 2012, and February 19, 2014. C.B. indicated at the stalking trial that Luke "return[ed] to Dillsboro" on January 3, 2014, that she saw him on that date, that he was "outside at various times throughout the day" which was "[j]ust like before," and that he "[p]ick[ed] up right where [he] left off." Circuit Transcript at 258-259. C.B. testified that Luke was watching the women "come and go again" and would "stare" at her. *Id.* at 259. When asked how Luke's course of conduct "for over two years," including the time period in January 2014, made her feel, C.B. responded: "It was very stressful. It was very intimidating, very nerve-racking [sic]. We - - I was afraid." *Id.* at 262-263. Also, the same photograph admitted into evidence at the trial in Cause No. 11 was again admitted into evidence. Chief Brandt testified and again offered testimony regarding the vandalism occurring in June 2013. Officer Cady testified regarding the surveillance video he reviewed, and the video was admitted into evidence. Officer Prarat testified about his encounter with Luke on January 8, 2014, in which Luke told him that "as far as he was concerned,

he could be outside and, come summer, he was going to be outside even more and the girls at the pharmacy just needed to get used to it." Circuit Transcript at 522. Officer Byron Wilber testified that he visited Luke on January 3, 2014, and advised him not to be on his porch. R.B. testified that Luke "returned" to the house on January 2, 2014, and "during the period of January 3rd to January 9th" he "was out on the porch again. . . . [Luke was] standing in the driveway by the parking lot, looking at the pharmacy, right by [her] car." *Id.* at 642. She testified that it appeared Luke did not have a purpose for being outside in the freezing weather and that his presence made her "[v]ery scared that marbles were going to start again, that he was going to hurt one of us." *Id.* at 644. T.R. testified that between January 3 and January 8, 2014, Luke was outside throughout the day despite the freezing temperature and would stare at her which made her feel "[s]cared, intimidated" because she "didn't even know why he was outside when it's so cold." *Id.* at 670. Also, Officer Olson testified and read the portion of the letter Luke wrote in which he stated that he "figured broken windows and flat tires would suffice as a humane wake-up call." *Id.* at 699.

[21] Also, the prosecutor in Cause No. 11 summed up the State's case at closing argument by stating that during the relevant time period Luke "continually harassed, intimidated and would not leave [T.R., C.B., and R.B.] alone," that a video shown at the trial demonstrated Luke "multiple times harassing and intimidating these girls," and that Officer Prarat told Luke that he "cannot harass" the girls. Superior Transcript at 417. The prosecutor argued that Luke

was "responsible for the terror that's been caused in these three (3) girls" and proceeded to recite the language of the No Contact Order, which again stated that contact includes "acts of harassment, stalking, intimidation . . . ." *Id.* at 418. He stated that "[a]ll three (3) of these girls testified that they were employed by Deville's Pharmacy and all the harassment, the intimidation, occurred directly across the street at the residence where he was staying." *Id.* at 419. The prosecutor specifically noted that, per the No Contact Order, contact includes harassment and informed the jury that they would be instructed on the definition of harassment, and he proceeded to argue that the evidence presented of Luke "staring" at the girls while it was freezing cold outside met the definition. *Id.* at 421. He also argued that Luke made sure he was "in a place where he can continually harass them" and that Luke "had the intention to harass and intimidate them." *Id.* at 422. He invited the jury to view Luke's actions in context, including the previous public indecency trial, acts of vandalism in the summer of 2013, and his earlier violation of the no contact order under Cause No. 564.

[22] During closing arguments in Cause No. 19, the prosecutor discussed the time period between January 3 and January 7, 2014, as follows:

> He's back again on January 2nd, 2014. Now, keep in mind, ladies and gentlemen, the ladies testified it's extremely cold this week. [T.R.] testified it's below zero and he's constantly outside of his residence, staring at the pharmacy, staring at them as they come and go. Look how close these individuals are. [R.B.] testified that's the front of her vehicle. He is from you to me, nothing in between them, just glaring at them as they come in and out of the

pharmacy. [C.B.] takes this photo. Look how close he is there, as well. He's been told to have no contact. Once again, how hard a concept is it? Go inside. These ladies are fearful of you and they are a victim of your prior crime. I understand you live there, but they are a victim of your crime. They have rights, too. You heard Major Jack Prarat talk about his talk with Billy. He said Billy told him, 'the police told me I couldn't be outside, my lawyer told me I couldn't be outside, but I'm going to be outside and the girls at the pharmacy are just going to have to get used to it'. It shows his state of mind, ladies and gentlemen. Byron Wilber testified. He told Billy on two occasions that he couldn't have contact with them, one of which he told him he couldn't be outside, to clarify it for him.

Circuit Transcript at 727-728.

[23] This Court has addressed a similar set of facts in *Burton v. State*, 665 N.E.2d 924 (Ind. Ct. App. 1996). Defendant Burton had previously been charged with battery and criminal recklessness as a result of beating a female victim with whom he had a previous romantic relationship. 665 N.E.2d at 925. Following the attack, the victim obtained a permanent protective order against him. *Id.* A few months later, Burton made several telephone calls and left messages for the victim, and on January 31, 1995, after approximately seven phone calls within a span of two and one-half hours and learning that Burton had been seen on the victim's driveway, the victim called the police. *Id.* Burton was charged with, and found guilty of, stalking, invasion of privacy, and harassment. *Id.* He was ordered to serve consecutive sentences for each of the offenses. *Id.*

[24] On appeal, Burton raised the issue that consecutive sentences for stalking and invasion of privacy violated double jeopardy principles. *Id.* at 926. After noting

that each offense contains an element that the other does not and that they were therefore "separate offenses under the 'same elements' test," we discussed the question of whether "the factual bases alleged by the State in the charging informations, and upon which the charges were predicated" constitute a double jeopardy violation. *Id.* at 927-928. We observed that stalking was charged as follows:

> On or about January 10, 1995, through and including on or about February 1, 1995, in Marion County, State of Indiana, the following named defendant, Donald Burton, knowingly or intentionally engaged in a course of conduct involving repeated or continuing harassment of [the victim], another person; and further that said conduct would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened, and that said conduct actually caused said other person to feel terrorized, frightened, intimidated, or threatened; and further that said conduct included at least two of the following actions:
>
> 1. On or about January 10, 1995, said defendant did called [sic] [the victim] at work.
>
> 2. On or about January 23, 1995, said defendant did called [sic] [the victim] numerous times.
>
> 3. On or about January 28, 1995, said defendant did call [the victim] at her home 3 times.
>
> 4. On or about January 29, 1995, said defendant did call [the victim] to inquire about a van parked near her home.
>
> 5. On or about January 31, 1995, said defendant did call and harass [the victim] numerous times . . . . ;

and further that said other person is a victim and that a Protective Order has been issued by a Court under Cause No. 49F029411PO3406 to protect said victim from the defendant; and further that the defendant has been given notice of said Order.

*Id.* at 928. We then observed that invasion of privacy was charged as follows:

On or about January 31, 1995, in Marion County, State of Indiana, . . . the following named defendant, Donald Burton, did knowingly or intentionally violate[:]

A protective order issued under IC 34-4-5.1-5(a)(1)(A), (B), or (C)

. . . .

That ordered said defendant to refrain from abusing, harassing or disturbing the peace of [the victim] by appearing at her home and calling her numerous times.

*Id.*

[25]     We held that:

In other words, the invasion of privacy information required proof that on January 31, 1995, Burton violated a protective order by appearing at [the victim's] home and calling her numerous times. The stalking information required proof that Burton knew a protective order had been issued and that he harassed [the victim] on at least two of the five listed occasions, one of which included Burton's calling and harassing [the victim] on January 31, 1995. While Burton's stalking conviction could have been based on any two of the five listed occasions, it was possible for the conviction to be based on Burton's actions on

January 31, 1995. These same actions were the sole basis of the invasion of privacy conviction. As a result, the manner in which the offenses were charged relieved the State of the requirement of proving additional facts to gain the invasion of privacy conviction beyond those required to prove the stalking conviction. Therefore, double jeopardy principles bar conviction for both offenses.

*Id.* We remanded to the trial court with instructions to vacate the conviction and sentence on the invasion of privacy charge. *Id.*

[26] Just as in *Burton*, the sole bases of Luke's invasion of privacy convictions were also presented to prove that Luke was guilty of stalking. To the extent the State suggests that all of Luke's convictions should stand because the invasion of privacy convictions were based on Luke violating the No Contact Order,[7] while his conviction for stalking punished him for engaging in "a knowing or an intentional course of conduct involving repeated or continuing harassment," the evidence presented by the State in Cause No. 11 was that Luke had "contact" with the female victims by harassing them. The prosecutor's closing arguments in both cases had the same theme, that Luke was constantly outside in freezing weather staring at the female victims. Indeed, the court instructed the jury in Cause No. 11 on the term "harassment" using the definition provided in the

---

[7] As Luke notes in his argument, the State is mistaken when it argues that the charging information for stalking under Cause No. 19 alleged that Luke violated a different no contact order than the No Contact Order referenced in the invasion of privacy charging information. The record reveals that the State amended the charging information in Cause No. 19 to reflect that stalking be prosecuted as a class C felony because Luke violated the no contact order issued under Cause No. 111, i.e., the No Contact Order.

stalking statute. Although the State presented substantially more evidence at the stalking trial in Cause No. 19 occurring over a longer time period, included in that evidence was *all* of the evidence presented in Dearborn Superior Court 2 in Cause No. 11. Consequently, we find that there exists a reasonable probability that the jury in Cause No. 19 used the same facts to reach its conviction for stalking that were used to convict Luke of the invasion of privacy counts charged in Cause No. 11, and we conclude that such convictions violate the actual evidence test under double jeopardy principles.

[27] Having so determined, we must decide what the appropriate remedy is under these circumstances. Ordinarily, the proper remedy would be to vacate the lesser offenses of invasion of privacy. *See Richardson*, 717 N.E.2d at 54 ("Because both convictions therefore cannot stand, we vacate the conviction with the less severe penal consequences and leave standing the robbery conviction."). In his brief, Luke directs our attention to Ind. Code § 35-41-4-3(a)(1) which provides that:

> A prosecution is barred if there was a former prosecution of the defendant based on the same facts and for commission of the same offense and if:
>
> > (1) the former prosecution resulted in an acquittal or a conviction of the defendant (A conviction of an included offense constitutes an acquittal of the greater offense, even if the conviction is subsequently set aside.) . . . .

[28] As noted, Luke's convictions for stalking and invasion of privacy constituted the "same offense" for double jeopardy purposes, and the facts presented in

prosecuting the invasion of privacy charges in Cause No. 11 were also presented when the State prosecuted Luke for stalking in Cause No. 19. The Cause No. 11 trial commenced on July 22, 2014, and Luke was found guilty on July 30, 2014. The trial in Cause No. 19 commenced on August 15, 2014, and Luke was found guilty on August 21, 2014.

[29] Based upon Ind. Code § 35-41-4-3(a)(1), the proper remedy is to vacate Luke's conviction for stalking. We therefore remand to the Dearborn Circuit Court with instructions to vacate Luke's stalking conviction and resentence accordingly. *See also Woods v. State*, 234 Ind. 598, 607, 130 N.E.2d 139, 143 (Ind. 1955) ("When the facts constitute two or more offences, wherein the lesser offence is necessarily involved in the greater . . . and when the facts necessary to convict on a second prosecution would necessarily have convicted on the first, then the first prosecution to a final judgment will be a bar to the second.").[8]

---

[8] The concurrence opines that Ind. Code § 35-41-4-3(a)(1) is not applicable under these circumstances because "[t]hese are different statutory offenses," that although the stalking prosecution should have been barred under Ind. Code § 35-41-4-4 Luke waived the issue by not filing a motion to dismiss below, but that "the subsequent conviction for stalking violated principles of double jeopardy and should be vacated." *Infra*, at 39-40. Ind. Code § 35-41-4-4 provides for a statutory right against successive prosecutions. *See Williams v. State*, 762 N.E.2d 1216, 1219 (Ind. 2002) (noting that certain charges were barred under Ind. Code § 35-41-4-4 and accordingly not reaching the defendant's constitutional double jeopardy claims). Conversely, "Indiana Code § 35-41-4-3 (2008) codifies protections against being placed in jeopardy more than once for the same offense." *Cleary v. State*, 23 N.E.3d 664, 668 (Ind. 2015); *see also State v. Boze*, 482 N.E.2d 276, 278 (Ind. Ct. App. 1985) (noting that Ind. Code § 35-41-4-3 "is a recognition and codification of the prohibition against double jeopardy"), *reh'g denied, trans. denied*. Thus, Section 3 codifies the Indiana Constitution's prohibition against double jeopardy. As noted in *Richardson*, "two or more offenses are the *'same offense'* in violation of Article I, Section 14 of the Indiana Constitution, if, with respect to either the statutory elements of the challenged crimes *or the actual evidence used to convict*, the essential elements of one challenged offense also establish the essential elements of another challenged offense." 717 N.E.2d at 49 (emphases added). Because we conclude that the convictions for stalking and invasion of privacy violate the actual evidence test, they also constitute the "same offense" for the purposes of Ind. Code § 35-41-4-3.

[30] The next issue is whether the trial court abused its discretion in admitting evidence of other bad acts at the trial in Cause No. 11. The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs "where the decision is clearly against the logic and effect of the facts and circumstances." *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001). "Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party." *Fleener v. State*, 656 N.E.2d 1140, 1141 (Ind. 1995) (citations omitted).

[31] Luke contends that the Dearborn Superior Court in his invasion of privacy trial abused its discretion under Ind. Evidence Rule 404(b) in admitting evidence that he vandalized the Pharmacy the prior summer, that he wrote a letter to one victim's mother in July 2013, and that he wrote to the prosecutor in June 2014 in which he stated: "Yes, I figured broken windows and flat tires would suffice

---

We further observe that, were Ind. Code § 35-41-4-3 not applicable, the correct remedy would be to vacate the lesser invasion of privacy convictions and keep the stalking conviction intact. *See Richardson*, 717 N.E.2d at 54-55 (noting that "[w]hen two convictions are found to contravene double jeopardy principles, a reviewing court may remedy the violation by reducing either conviction to a less serious form of the same offense if doing so will eliminate the violation," that "[i]f it will not, one of the convictions must be vacated," and that the reviewing court "will make this determination itself, being mindful of the penal consequences that the trial court found appropriate," and vacating "the conviction with the less severe penal consequences . . .").

as a humane wake up call." Appellant's Brief at 35. He argues that the State could not admit this evidence to show intent unless he advanced a contrary claim, and here he "merely maintained his innocence . . . ." *Id.* at 37. Regarding motive, Luke argues that the fact that he engaged in other behavior directed at the Pharmacy employees does not relate to whether he had contact with them between January 3 and January 7, 2014. He also argues that, even if relevant, this evidence should have been excluded under Ind. Evidence Rule 403 because its prejudicial nature outweighed its probative value and that the evidence was not harmless.

[32] The State contends that Luke's intent when he was on his porch and driveway was the central issue at the invasion of privacy trial and that the evidence presented demonstrated that his presence was much more menacing than the version his counsel presented at trial. It further argues that the court was meticulous in keeping out certain evidence which it found to be unduly prejudicial.

[33] Ind. Evidence Rule 404(b) provides:

> **(b) Crimes, Wrongs, or Other Acts.**
>
> > (1) *Prohibited Uses*. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> >
> > (2) *Permitted Uses; Notice in a Criminal Case*. This evidence may be admissible for another purpose, such as proving

motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. On request by a defendant in a criminal case, the prosecutor must:

> (A) provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and

> (B) do so before trial--or during trial if the court, for good cause, excuses lack of pretrial notice.

[34] The standard for assessing the admissibility of Rule 404(b) evidence is: (1) the court must determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the court must balance the probative value of the evidence against its prejudicial effect pursuant to Rule 403. *Boone v. State*, 728 N.E.2d 135, 137-138 (Ind. 2000), *reh'g denied*; *Hicks v. State*, 690 N.E.2d 215, 221 (Ind. 1997). The evidence is inadmissible when the State offers it only to produce the "forbidden inference" that the defendant has engaged in other, uncharged misconduct and the charged conduct was in conformity with the uncharged misconduct. *Crain v. State*, 736 N.E.2d 1223, 1235 (Ind. 2000). The trial court has wide latitude, however, in weighing the probative value of the evidence against the possible prejudice of its admission. *Id.* If evidence has some purpose besides behavior in conformity with a character trait and the balancing test is favorable, the trial court can elect to admit the evidence. *Boone*, 728 N.E.2d at 138. For instance, evidence which is necessary for the jury to

understand the relationships between the victim, various witnesses, and the defendant may be admissible. *See Wilson*, 765 N.E.2d at 1270-1271.

[35] At trial, the State presented certain evidence, over objection by Luke, under Ind. Evidence Rule 404(b). Police Chief Brandt testified regarding multiple acts of vandalism occurring in the summer of 2013, including a marble breaking the windshield of the Pharmacy delivery van, marbles breaking windows of the Pharmacy building, and a tire being flattened and the words "punk bitch" being etched into the truck of T.R.'s boyfriend. Chief Brandt also testified that Luke presented him with a letter addressed to the mother of T.R. with instructions that Chief Brandt deliver the letter in June or July 2013.[9] Also, Deputy Prosecutor Sharp testified about receiving a letter from Luke in June 2014 which stated in part: "I figured broken windows and flat tires would suffice as a humane wake up call." Superior Transcript at 390. This evidence illuminated the nature of the relationship between Luke and the three female victims and was admissible to demonstrate Luke's intent to harass them when he was outside in January 2014, despite freezing temperatures, and stared at them from his porch and driveway, which was the central issue at trial. *See Ross v. State*, 676 N.E.2d 339, 346 (Ind. 1996) (holding that prior misconduct was "admissible because it demonstrated the defendant's motive and intent to commit the murder and illuminated the relationship between the defendant and victim"); *Elliott v. State*, 630 N.E.2d 202, 204 (Ind. 1994) (prior threats of

---

[9] This is the same act for which Luke was charged with attempted invasion of privacy in Cause No. 564.

violence to ex-wife and victim admissible to show the relationship between the parties and defendant's motive), *reh'g denied*; *Price v. State*, 619 N.E.2d 582, 584 (Ind. 1993) (prior bad acts against the victim are admissible "to show the relationship between the parties and appellant's motive"), *reh'g denied*; *Iqbal v. State*, 805 N.E.2d 401, 408-409 (Ind. Ct. App. 2004) (holding that evidence relating to a prior incident in which the defendant put a gun to the victim's head and threatened to kill her was indicative of the defendant's relationship with the victim and highly relevant for his motive to shoot the victim, that the defendant's "assertion of an accident is indicative of the nature of the relationship between the parties, characterized by jealousy and denial, and ultimately culminating into hostility and murder," that the evidence was "relevant to show the absence of the gun accidentally being fired," and that the trial court did not abuse its discretion by admitting the defendant's bad acts under Rule 404(b)).

[36] In addition, the 404(b) testimony was not significantly prejudicial. The trial court carefully parsed such evidence to ensure that only the relevant evidence was presented. Indeed, regarding the letter presented to Deputy Prosecutor Sharp, the court allowed only the single statement "I figured broken windows and flat tires would suffice as a humane wake up call," to be admitted. Superior Transcript at 390. *See Hicks*, 690 N.E.2d at 223 (noting that "at some point testimony about every incident of violence between the two becomes more prejudicial than probative," that evidence of two of the incidents illustrated the hostile relationship that could have been a motive for murder,

that evidence of a third incident was graphic and of fairly low probative value in view of its remoteness in time and thus inadmissible, and that considered in light of the other evidence about the relationship, the improperly-admitted evidence regarding the third incident was not grounds for reversal). The trial court did not abuse its discretion in admitting the challenged evidence.

## III.

[37] The next issue is whether the evidence is sufficient to sustain Luke's convictions for invasion of privacy. When reviewing claims of insufficiency of the evidence, we do not reweigh the evidence or judge the credibility of witnesses. *Gray v. State*, 903 N.E.2d 940, 943 (Ind. 2009). Rather, we look to the evidence and the reasonable inferences therefrom that support the verdict. *Id.* We will affirm the conviction if there exists evidence of probative value and reasonable inferences drawn from that evidence upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.*

[38] The offense of invasion of privacy is governed by Ind. Code § 35-46-1-15.1, which, at the time of the offenses, provided in relevant part that "[a] person who knowingly or intentionally violates: . . . (6) a no contact order issued as a condition of probation; . . . commits invasion of privacy, a Class A misdemeanor. However, the offense is a Class D felony if the person has a prior unrelated conviction for an offense under this section." (Subsequently amended by Pub. L. No. 158-2013, § 557 (eff. July 1, 2014)).

[39]  Luke argues that his actions, in which "[i]t is undisputed that [he] did nothing more than stand outside his home across the street from the pharmacy and look at the women from time to time," do not constitute "contact" for the purposes of his No Contact Order, and that accordingly he did not commit invasion of privacy. Appellant's Brief at 24. He asserts that Indiana caselaw has made clear that "contact" requires more than mere presence. *Id.* at 25 (citing *Hunter v. State*, 883 N.E.2d 1161 (Ind. 2008)). He argues that the State alleged at trial that Luke both intimidated and harassed the women at the Pharmacy to prove the crimes, but "[h]e was on trial for invasion of privacy, not harassment or intimidation." *Id.* at 27. He also argues that allowing allegations of intimidation and harassment at his trial for three counts of invasion of privacy allowed the State and its witnesses to define what constituted "contact" but that simply because certain witnesses thought that his conduct constituted contact does not make it so. He maintains that he was allowed to be on his porch under the terms of the in-home detention order, that the no-contact order was vague, and that accordingly the State did not prove that he knowingly or intentionally violated the No Contact Order.

[40]  The State argues that Luke's reliance on *Hunter* is misplaced because his conduct is distinguishable and that his conduct was not "mere presence" and instead was intentional and menacing and communicated to the victims "that neither they nor the court system could control what he chose to do." Appellee's Brief at 20. The State maintains that this criminal intent was supported by other evidence, including the letter stating that "broken windows

and flat tires would suffice as a 'wake up call.'" *Id.* The State further argues that Luke's assertion that he was unaware that being on his porch would be a violation is meritless and is "akin to the insolent claim of a child in the backseat of a car snidely saying that he is not 'touching' his trembling sibling despite the fact that the child is defiantly holding a finger an inch away from their sibling." *Id.* at 21.

[41] We discussed in Part I the evidence presented to prove that Luke committed invasion of privacy. Specifically, the No Contact Order stated that contact "includes, but is not limited to, acts of harassment, stalking, intimidation, threats, and physical force of any kind." State's Superior Court Exhibits 11-13. The State presented substantial evidence that Luke engaged in repeated behavior designed to harass and intimidate T.R., C.B., and R.B., by his presence outside his home adjacent to the Pharmacy parking lot, in which he frequently stared at the women when they were outside. The female victims testified that Luke's conduct made them fearful.

[42] To the extent Luke suggests that *Hunter* requires reversal, we disagree. In that case, the State sought to revoke defendant Theron Hunter's probation and, following a hearing, the court "found that he had violated the conditions of his probation, finding that he had been 'living in a residence located approximately 15 feet from a house trailer where three (3) minor children reside with their parents and that he has been in the house trailer at least once a week while the children were present.'" 883 N.E.2d at 1162. The condition of probation Hunter was found to have violated required that he "must never be alone with

or have contact with any person under the age of 18. Contact includes face-to-face, telephonic, written, electronic, or any indirect contact via third parties. You must report any incidental contact with persons under age 18 to your probation officer within 24 hours of the contact." *Id.* The evidence presented at the hearing was essentially that Hunter moved into an RV parked on property owned by his father, which was adjacent to his father's residence and a mobile home occupied by his half-sister, her husband, and three children. *Id.* During that time, Hunter worked construction for his father in the early mornings and began to work in the afternoons doing construction in his sister's trailer, remodeling her bathroom. *Id.* Hunter intended to leave the home prior to when his sister's children arrived home from school, but there were times when the children arrived before he had left, and Hunter explained that on such occasions

> "[a]s soon as they came in, as fast as I could, I would pack up my tools and get out the door until the next day." [Transcript] at 24. He emphasized that "I didn't sit down with them. I didn't have anything to do with them as far as wrestlin' around, playing with them, nothing at all." *Id.* at 23-24. The defendant knew he "wasn't supposed to have contact with them as far as like he, [the probation officer] said as far as talking to them, face to face . . . interaction type of stuff. And I did not have interaction type stuff with them."

*Id.* at 1162-1163.

[43] The Indiana Supreme Court observed that "the word 'contact' is not commonly understood to occur by mere presence alone." *Id.* at 1164. The Court found

the condition of probation to be ambiguous, noting that "[i]f the trial court intended a condition of probation to prohibit the defendant from the behavior shown by the evidence in this case, effective deterrence and fair advance notice necessitate that the choice of language must clearly describe the prohibited conduct." *Id.* It held that, accordingly, the evidence was insufficient to establish that his conduct constituted a violation of the asserted condition of probation. *Id.*

[44] By contrast, the evidence presented here demonstrated that Luke's actions far exceeded the "mere presence" the Court discussed in *Hunter*. Despite warnings from attorneys and police to go inside if one of the victims was in the parking lot, Luke did not do so and instead stared directly at the women. When he was informed by Officer Prarat that his actions were causing fear in the women, Luke responded that "he was going to be outside and come summer he was going to be out even more and the girls at the pharmacy just needed to get used to it." Superior Transcript at 221-222. The No Contact Order specified that contact for the purposes of the order "includes, but is not limited to, acts of harassment, stalking, intimidation, threats, and physical force of any kind." State's Superior Court Exhibits 11-13. Further, we note that "[i]ntent can be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points. The fact finder is entitled to infer intent from the surrounding circumstances." *Lee v. State*, 973 N.E.2d 1207, 1210 (Ind. Ct. App. 2012) (citations omitted), *trans. denied*.

Based upon the record, we conclude that evidence of probative value was presented from which the jury could find beyond a reasonable doubt that Luke committed the offenses of invasion of privacy as class D felonies.[10]

## IV.

The next issue is whether the court abused its discretion in instructing the jury. Generally, "[t]he purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Overstreet v. State*, 783 N.E.2d 1140, 1163 (Ind. 2003), *cert. denied*, 540 U.S. 1150, 124 S. Ct. 1145 (2004). Instruction of the jury is generally within the discretion of the trial court and is reviewed only for an abuse of that discretion. *Id.* at 1163-1164. To constitute an abuse of discretion, the instruction given must be erroneous, and the instructions taken as a whole must misstate the law or

---

[10] Luke argues in his brief that he was denied due process in the enforcement of the No Contact Order, asserting that a reasonable person in his position would not believe that standing on his porch or in his driveway would violate the No Contact Order. In support of his argument, he cites to *VanHorn v. State*, 889 N.E.2d 908 (Ind. Ct. App. 2008), *trans. denied*, in which this court held that the evidence was insufficient to prove that VanHorn committed stalking where the evidence presented was that VanHorn was observed sitting in his car parked on a city street near the home of Robert Franks on multiple occasions. 889 N.E.2d at 909, 912-914. The court noted that VanHorn "had no notice of the impermissibility of his conduct," that "[t]he issuance of a protective order pursuant to Indiana Code Section 34-26-5 would address our concerns by providing notice to the individual, an opportunity to be heard, and, where the issuance of a protective order is justified, a clear statement that his or her conduct is impermissible," and that "[n]o protective order was sought in this case." *Id.* at 913.

As discussed above, the State proved that Luke committed invasion of privacy when he violated the No Contact Order by harassing C.B., R.B., and T.R., and that the State proved harassment by demonstrating that his conduct far exceeded his "mere presence" of being outside. Luke's argument is without merit.

otherwise mislead the jury. *Benefiel v. State*, 716 N.E.2d 906, 914 (Ind. 1999), *reh'g denied*, *cert. denied*, 531 U.S. 830, 121 S. Ct. 83 (2000).

[47] Before a defendant is entitled to a reversal, he must affirmatively show that the erroneous instruction prejudiced his substantial rights. *Lee v. State*, 964 N.E.2d 859, 862 (Ind. Ct. App. 2012) (citing *Gantt v. State*, 825 N.E.2d 874, 877 (Ind. Ct. App. 2005)), *trans. denied*. An error is to be disregarded as harmless unless it affects the substantial rights of a party. *Id.* (citing *Oatts v. State*, 899 N.E.2d 714, 727 (Ind. Ct. App. 2009); Ind. Trial Rule 61).

[48] Luke argues that he was charged with invasion of privacy which requires proof that he impermissibly contacted the Pharmacy employees, that the women's subjective fear is immaterial to the charged acts, that harassment is a different crime which does involve fear, and that by instructing the jury on harassment the court incorrectly stated the law as it pertains to the crime of invasion of privacy. He also argues that this error was not harmless because it led the jury to focus on whether the women were afraid and encouraged the jury to convict if it found that the women were afraid.

[49] The State argues that by the terms of the No Contact Order harassing the victims constituted a violation, therefore proving Luke's guilt of the crime of invasion of privacy, and thus instructing the jury on the definition of harassment was appropriate. The State asserts that merely because the definition is founded upon the stalking statute does not negate its application to the invasion of privacy charges. The State also argues that even if the

instruction was given in error, such error is harmless because the evidence presented demonstrated that Luke repeatedly stared and glared at the female victims from his yard, driveway, and porch while they walked to and from the pharmacy, that even without the instruction the jurors would have understood the common meaning of the term harassment, and that the jury would have decided based thereon that his actions violated the No Contact Order.

[50] As discussed in Part I, the court in Final Jury Instruction No. 9 instructed the jury on the definition of harassment consistent with the definition of "harassment" found at Ind. Code § 35-45-10-2. The court instructed the jury in this manner because the No Contact Order specifically instructed Luke that contact "includes, but is not limited to, *acts of harassment*, stalking, intimidation, threats, and physical force of any kind." State's Superior Court Exhibits 11-13 (emphasis added). We concluded in Part III that, based upon the language of the No Contact Order, it was proper for the State to prove invasion of privacy by showing that Luke harassed the female victims. Accordingly, we conclude that the court did not abuse its discretion in instructing the jury on the definition of harassment.

V.

[51] The next issue is whether the evidence is sufficient to revoke Luke's probation. Probation is an alternative to commitment in the DOC, and is at the sole discretion of the trial court. *Cox v. State*, 706 N.E.2d 547, 549 (Ind. 1999), *reh'g denied*. A defendant is not entitled to serve a sentence on probation. *Id.*

Rather, probation is a "matter of grace" and a "conditional liberty that is a favor, not a right." *Id.* Probation revocation is governed by Ind. Code § 35-38-2-3, and a revocation hearing is civil in nature, the State needing only to prove the alleged violations by a preponderance of the evidence. *Id.* at 551. We consider all the evidence most favorable to supporting the judgment of the trial court without reweighing that evidence or judging the credibility of witnesses. *Id.* If there is substantial evidence of probative value to support the trial court's conclusion that a defendant has violated any terms of probation, we will affirm its decision to revoke. *Id.* The violation of a single condition of probation is sufficient to revoke probation. *Wilson v. State*, 708 N.E.2d 32, 34 (Ind. Ct. App. 1999).

[52] At the time Luke was placed on probation, Ind. Code § 35-38-2-3(a) provided: "The court may revoke a person's probation if: (1) the person has violated a condition of probation during the probationary period . . . ." Ind. Code § 35-38-2-3(a) (Supp. 2012) (subsequently amended by Pub. L. No. 74-2015, § 21 (eff. July 1, 2015)), and Ind. Code § 35-38-2-3(f) provided that "the state must prove the violation by a preponderance of the evidence."[11]

[53] The Dearborn Superior Court 2 held proceedings in both Cause No. 11, the invasion of privacy trial, and Cause No. 564, the probation revocation. The court in Cause No. 564 revoked Luke's probation based upon his convictions

---

[11] The current versions of Ind. Code § 35-38-2-3(a) and (f) are identical to the 2012 versions.

for invasion of privacy under Cause No. 11. The requirement that a probationer obey federal, state, and local laws is automatically a condition of probation by operation of law. *Williams v. State*, 695 N.E.2d 1017, 1019 (Ind. Ct. App. 1998); Ind. Code § 35-38-2-1(b) (Supp. 2012) ("If the person commits an additional crime, the court may revoke the probation."). In Part III, we affirm Luke's convictions for invasion of privacy. Based upon the record, we conclude that the court as the finder of fact could reasonably conclude by a preponderance of the evidence that while on probation Luke committed the new offense of invasion of privacy. Accordingly, the court did not abuse its discretion in revoking his probation.

## *Conclusion*

For the foregoing reasons, we remand to the Dearborn Circuit Court with instructions to vacate Luke's conviction for stalking as a class C felony, and we affirm Luke's convictions for invasion of privacy as class D felonies, as well as the revocation of his probation.

Affirmed in part, reversed in part, and remanded.

Riley, J., concurs.

Altice, J., concurs in part and concurs in result as to issue I.

# IN THE
# COURT OF APPEALS OF INDIANA

Billy Luke,

*Appellant-Defendant*,

v.

State of Indiana,

*Appellee-Plaintiff*.

Court of Appeals Case No.
15A01-1409-CR-407

**Altice, Judge, concurring in part and concurring in result as to issue I.**

[56] With respect to the first issue, I agree with my colleagues that Luke's conviction for stalking cannot stand because his dual convictions for stalking and invasion of privacy violated the actual evidence test and, thus, constituted a double jeopardy violation. I do not agree, however, with the majority's reliance on Ind. Code Ann. § 35-41-4-3(a)(1). This statute is not applicable because the subsequent prosecution for stalking was not "for commission of the same

offense" (i.e., invasion of privacy) for which Luke had already been convicted. I.C. § 35-41-4-3(a).[12] These are different statutory offenses and double jeopardy issues arose here only because the State failed to parse the evidence and carefully establish each with different evidence.

[57] The circumstances presented in this case would more likely fall under I.C. § 35-41-4-4, which provides:

> (a) A prosecution is barred if all of the following exist:
>
>> (1) There was a former prosecution of the defendant for a different offense or for the same offense based on different facts.
>>
>> (2) The former prosecution resulted in an acquittal or a conviction of the defendant….
>>
>> (3) The instant prosecution is for an offense with which the defendant should have been charged in the former prosecution.
>
> (b) A prosecution is not barred under this section if the offense on which it is based was not consummated when the trial under the former prosecution began.

---

[12] As noted by the majority, this statute is a codification of the prohibition against double jeopardy. *See State v. Boze*, 482 N.E.2d 276, 278 (Ind. Ct. App. 1985). However, as recognized in *Boze*, "[the statute] does not encompass the entire law concerning double jeopardy". *Id*. In my view, the statute addresses only subsequent prosecutions for the same statutory offense or for a greater offense when the defendant has been convicted of a lesser-included offense. I do not agree with the majority that the statute is a broad codification of the actual evidence test.

We have held that this successive prosecution statute acts to bar a subsequent prosecution only when the defendant seeks dismissal prior to commencement of the second trial. *See Hamer v. State*, 771 N.E.2d 109, 112 (Ind. Ct. App. 2002) (regardless of whether the subsequent prosecution was barred under the statute, the defendant waived the issue when he failed to seek dismissal prior to the second trial). Luke did not file a motion to dismiss and, therefore, waived any statutory claim that the subsequent prosecution was barred.

[58] Statutes aside, I think it suffices to say that the subsequent conviction for stalking violated principles of double jeopardy and should be vacated.