## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 14 2016, 8:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Bruce E. Fein
W. Bruce DelValle
Fein & DelValle PLLC
Washington, District of Columbia

Susan D. Rayl
Smith Rayl Law Office, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Michael G. Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Edward A. Young, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 14, 2016 <br><br> Court of Appeals Case No. <br> 29A02-1508-CR-1240 <br><br> Appeal from the Hamilton Superior Court. <br> The Honorable Daniel J. Pfleging, Judge. <br> Cause No. 29D02-1310-FC-8987 |

**Barteau, Senior Judge**

# Statement of the Case

Edward A. Young appeals his convictions by a jury of forgery, a Class C felony;[1] insurance fraud, a Class D felony;[2] and theft, a Class D felony.[3] We affirm.

# Issues

Young raises six issues, which we consolidate and restate as:

I.  Whether the prosecution engaged in misconduct during voir dire that amounted to fundamental error.

II.  Whether the trial court erred in admitting an exhibit.

III.  Whether the trial court erred in its jury instructions.

IV.  Whether the evidence is sufficient to sustain Young's convictions.[4]

# Facts and Procedural History

Irene Gentry[5] is an independent insurance agent and, during the period of time relevant to this case, was licensed to sell life, accident, and health insurance. In 2007 or 2008, Gentry's son introduced her to Edward A. Young. Gentry and Young became friends and attended prayer meetings together. She was aware

---

[1] Ind. Code § 35-43-5-2 (2006).

[2] Ind. Code § 35-43-5-4.5 (2005).

[3] Ind. Code § 35-43-4-2 (2009).

[4] Young has filed a Motion for Oral Argument. We deny the motion by separate order.

[5] Gentry was known as Irene Schwartz during the period of time relevant to this case. She married while this case was pending and changed her last name to Gentry.

that he was also an independent insurance agent and occasionally referred customers to him.

[4] Young's family owned Liberty Insurance Agency, LLC. His wife and son were listed as Liberty Insurance's officers on documents filed with the Indiana Secretary of State. In 2010, an employee of Liberty Insurance helped Gentry apply for life insurance for herself. She filled out an application containing information including her address, social security number, and date of birth. By 2012, Young and his wife had surrendered their licenses to sell insurance in Indiana, but Liberty Insurance continued to operate.

[5] In early 2012, Fidelity Life Association, a life insurance company, received a "General Agent Application" that purported to have been signed by Irene Gentry on February 29, 2012. State's Ex. 1. It contained her correct phone number, social security number, and state-issued insurance license numbers, but an incorrect fax number, email address, and federal tax ID number. In fact, Gentry neither prepared nor signed the application and did not authorize anyone to prepare it or sign it on her behalf.

[6] The applicant asked Fidelity Life to appoint Gentry to sell Fidelity Life's policies. The applicant further asked Fidelity Life to pay Gentry's commissions to Liberty Insurance. The application had several attachments, including an authorization for electronic fund transfers of commissions to Liberty Insurance's bank account. In another attachment, Gentry was incorrectly identified as the Vice-President of Liberty Insurance. The application also

included a federal W-9 form, entitled "Request for Taxpayer Identification Number and Certification." State's Ex. 1. The W-9 form was purportedly signed by Gentry on behalf of Liberty Insurance. On the W-9 form, an address was listed for Liberty Insurance that was, in reality, Young's home address.

[7]     Fidelity Life accepted the application and authorized Gentry to sell its insurance policies as an independent agent. Subsequently, Liberty Insurance sold multiple life insurance policies under Gentry's name. Fidelity Life paid commissions to Liberty Insurance's employees, including Young, his son, and his daughter-in-law. The commissions were advance payments, based on a projection of the premiums the policyholders are expected to pay. When policyholders fail to pay premiums, Fidelity Life considers the commissions to be debts owed to Fidelity Life by the agent. In this case, policyholders failed to pay the premiums for several Fidelity Life policies sold by Liberty Insurance's employees. Fidelity Life deemed Gentry, the person who allegedly signed the application, to be ultimately responsible for the debts.

[8]     Meanwhile, in December 2012, Gentry applied to Oxford Life to sell their insurance policies. She had not previously been an agent of that company. Oxford Life informed her she was already their appointed agent through Liberty Insurance and owed them money for advance commissions on premiums that were not paid. The company further informed Gentry that, due to her unpaid debt, it had listed her on Vector. Vector is a list of insurance agents who owe debts to insurance companies. The list is shared among insurance companies, and if an agent is placed on the list, "that pretty much

paralyzes you." Tr. p. 222. As Gentry explained, insurance companies will not appoint agents who are on the list, and "you can't do business." *Id.*

[9] After obtaining additional information from Oxford Life, Gentry contacted Young. When Gentry told Young that Oxford Life had placed her on Vector due to Liberty Insurance's actions, he promised to resolve the situation "today." *Id.* at 225. He acknowledged writing policies in her name without her consent or permission. *Id.* at 255. She asked where the unearned commissions had gone, and he said "they went to the ministry." *Id.* at 226. Later, in an email to Gentry, Young acknowledged incurring a "$4,600 debt for for [sic] you without your consent or knowledge." State's Ex. 4.

[10] An investigator employed by Oxford Life contacted Young, who acknowledged in a recorded phone conversation that he entered into an agreement with Oxford Life using Gentry's name "without her consent or even her knowledge." State's Ex. 9. He further admitted Gentry did not sign the application, and he promised to personally repay the $4,600 debt. Oxford Life eventually removed its complaint against Gentry from Vector. In January 2013, Young told Gentry he had "acknowledged my sin before the Lord and you and finally Oxford." State's Ex. 5.

[11] Meanwhile, Gentry received a statement from Fidelity Life claiming she was their appointed agent and owed them $10,000 in connection with commissions paid to Liberty Insurance. In February 2013, Gentry emailed Young to notify him Fidelity Life believed she owed them money and had listed her on Vector.

She accused him of writing policies in her name. She further told him, "I haven't been able to work for almost 3 month[s]." State's Ex. 6.

[12] Gentry informed Fidelity Life she was not responsible for the debt, and the company assigned an investigator. In an email to the investigator, Young admitted, "without [Gentry's] approval or consent I created a debt for her with Fidelity Life." State's Ex. 11. He admitted that he had been "wrong." *Id.* Young agreed with the investigator's assessment that he had prepared Fidelity Life insurance policies in Gentry's name and had personally received advance commissions from Fidelity Life.

[13] The matter subsequently came to the attention of the Indiana State Police and the Indiana Department of Insurance. The State charged Young with forgery (in relation to the false application submitted to Fidelity Life), insurance fraud (in relation to the false commission reports submitted to Fidelity Life), and theft (taking unearned funds from Fidelity Life). Prior to trial, Young filed a motion in limine to exclude any evidence related to Oxford Life. The trial court denied the motion. During trial, after the State's presentation of evidence Young moved for a directed verdict as to the charge of insurance fraud. The court denied the motion, and the trial continued. A jury determined Young was guilty as charged. The court imposed a sentence, and this appeal followed.

# Discussion and Decision

## I. Prosecutorial Misconduct and Fundamental Error

[14] Young argues the prosecutor made unfairly prejudicial remarks during voir dire proceedings. He concedes he did not object to any of those remarks, so he further argues the remarks amounted to fundamental error. In response, the State asserts the prosecutor did not engage in misconduct.

[15] When a claim of prosecutorial misconduct has been procedurally defaulted for failure to properly raise the claim in the trial court, the defendant must establish not only the grounds for prosecutorial misconduct but also that the misconduct amounted to fundamental error. *Ryan v. State*, 9 N.E.3d 663, 667-68 (Ind. 2014). In reviewing a claim of prosecutorial misconduct, we must determine whether (1) the prosecutor engaged in misconduct and, if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she should not have been subjected. *Booher v. State*, 773 N.E.2d 814, 817 (Ind. 2002). The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct. *Carter v. State*, 956 N.E.2d 167, 169 (Ind. Ct. App. 2011), *trans. denied*.

[16] The fundamental error exception to the requirement for a contemporaneous objection is extremely narrow. *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2012). To be fundamental error, misconduct must have made a fair trial impossible or been a clearly blatant violation of basic and elementary principles of due

process that presents an undeniable and substantial potential for harm. *Deaton v. State*, 999 N.E.2d 452, 454 (Ind. Ct. App. 2013), *trans. denied*. The fundamental error exception is available only in egregious circumstances. *Brown*, 929 N.E.2d at 207.

[17] The purpose of voir dire is to determine whether potential jurors can render a fair and impartial verdict in accordance with the law and the evidence. *Carter v. State*, 932 N.E.2d 1284, 1288 (Ind. Ct. App. 2010). Voir dire panelists may be asked questions to identify bias but not to condition them to be responsive to the questioner's position. *Deaton*, 999 N.E.2d at 455. Proper examination may include questions designed to disclose the panelists' attitudes about the type of offense charged. *Steelman v. State*, 602 N.E.2d 152, 158 (Ind. Ct. App. 1992). Similarly, the parties may attempt to uncover panelists' preconceived ideas about a defense the defendant intends to use. *Id.* As part of this process, the parties may pose hypothetical questions, provided they do not suggest prejudicial evidence not adduced at trial. *Id.*

[18] Young claims the prosecutor erred by discussing the elements of the charged offenses with the voir dire panel and by presenting hypotheticals. The prosecutor began his voir dire questioning by noting the trial court "read out the crimes that the Defendant is charged with," Tr. p. 55, and asking the panelists to explain their understandings of the offenses. These questions appropriately allowed the prosecutor to discover the panelists' perspectives on the offenses and to potentially detect any biases. *See Steelman*, 602 N.E.2d at 158 (no prosecutorial misconduct in asking jurors about the offense of dealing drugs

within 1,000 feet of school property). Similarly, the hypotheticals the prosecutor mentioned during his discussion of the offenses were presented in the context of asking jurors for their understanding of what acts might violate the governing statutes.

[19] Young further challenges as misconduct the prosecutor's questioning of potential jurors using the following hypothetical:

> Juror No. 10, I'm going to give you a scenario. All right. You are a - you're a law enforcement officer. You're in your patrol car driving down the road, and you observe a vehicle speeding. So, you turn on your lights, pull them over. When you approach, you see that there's four people in the vehicle. As you have the - the driver rolls down their window, and as you approach to explain to the driver why you pulled them over, you observe contraband in the back seat between the two back seat passengers. Specifically, we'll say a bag of crack cocaine. How do you figure out whose – whose contraband drugs that is?

[20] Tr. pp. 70-71. The prosecutor added an additional circumstance to the hypothetical, specifically that one of the back seat passengers claimed ownership of the cocaine.

[21] The questions resulted in several panelists explaining how they would determine who owned the cocaine and how they would address the passenger's statement. The hypothetical thus focused on core jury functions such as assigning responsibility for offenses and weighing witness credibility. Those functions were crucial in this case, where Young pursued a strategy of arguing someone else committed the offenses even though the record also indicated he made several incriminating statements. As a result, the hypothetical did not

amount to prosecutorial misconduct, much less fundamental error. *See Carter*, 932 N.E.2d at 1289 (prosecutor's hypothetical did not amount to misconduct because it allowed the prosecutor to test the voir dire panelists' willingness to follow court instructions).

[22] Young cites *Foster v. State*, 436 N.E.2d 783 (Ind. 1982), but that case is distinguishable. In *Foster*, a prosecutor gave a lengthy statement during voir dire, including reading the charging information, quoting from the statutes that governed the offenses, and discussing the possible penalties Foster faced if found guilty. Young claims our Supreme Court condemned the prosecutor's discussion of the criminal statutes and further claims the case establishes that a prosecutor should not review the elements of an offense with prospective jurors.

[23] We disagree with Young's reading of *Foster*. In our view, the Court's disapproval was focused on the prosecutor's explanation to the panelists of the penalties Foster faced. The Court stated, "Since the jury no longer serves any function with respect to determination of the sentence, it is not to be advised of the possible penalties." *Id.* at 786. The Court further explained, "Despite Defendant's timely and continuing objection, the trial court took no steps to prevent the Prosecutor from improperly instructing the jury about matters that the law entrusts to the trial court. The trial court's inaction allowed the State to cultivate bias about penalties in its favor in the voir dire when it could not cultivate that same bias in tendered instructions." *Id.* at 788.

In the current case, the prosecutor did not discuss Young's possible sentence. For that reason, *Foster* is inapplicable, and the prosecutor did not commit misconduct during voir dire.

## II. Admission of Evidence

Young claims the trial court should not have admitted State's Exhibit 9, a recording of a phone conversation between Young and an investigator for Oxford Life. The State argues the trial court did not err because the exhibit was admissible and the trial court cured any problems by giving a limiting instruction to the jury.

The admission and exclusion of evidence falls within the sound discretion of the trial court and is reviewed only for an abuse of discretion. *Dunlap v. State*, 761 N.E.2d 837, 841 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances. *Guffey v. State*, 42 N.E.3d 152, 158 (Ind. Ct. App. 2015), *trans. denied*.

Young claims the admission of Exhibit 9 violated Indiana Evidence Rule 404(b), which provides:

> (1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
>
> (2) *Permitted Uses; Notice in a Criminal Case.* This evidence may be admissible for another purpose, such as proving motive,

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

[28] When considering whether to admit evidence under Rule 404(b), a trial court must determine whether the evidence of other crimes, wrongs, or acts is relevant to a matter other than the defendant's propensity to commit the charged act. *Luke v. State*, 51 N.E.3d 401, 416 (Ind. Ct. App. 2016), *trans. denied*. In addition, the court must balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Id.* The trial court has wide latitude in weighing the probative value of evidence against the possible prejudicial effect of its admission. *Id.*

[29] In this case, the jury heard Exhibit 9, a recording of a telephone conversation between Young and an investigator for Oxford Life. During the recording, Young admitted to the investigator that he entered into an agreement with Oxford Life using Gentry's name "without her consent or even her knowledge." State's Ex. 9. He further stated, "I got her into this bit with your company, and it's wrong." *Id.* Young conceded he wrote Oxford Life policies for customers, using Gentry's name, without her authorization. Finally, Young promised the investigator he would pay the balance owed to Oxford Life "with the resources I personally have." *Id.*

[30] The trial court admitted Exhibit 9 for the "limited purpose of finding preparation, plan, knowledge, identity, and absence of mistake." Tr. p. 309. Evidence of prior wrongdoing admitted under the identity exception is generally evaluated based upon whether the prior wrongdoing establishes a

signature crime with a common modus operandi. *Bishop v. State*, 40 N.E.3d 935, 952 (Ind. Ct. App. 2015), *trans. denied*. The rationale behind the identity exception is that if crimes are sufficiently similar and unique, it is highly probable that the same person committed all of them. *Id.* The prior wrongdoing must be significantly related to the charged crime in time, place, and circumstance. *Id.*

[31] During trial, Young denied having filled out the fraudulent application for Fidelity Life using Gentry's name or submitting requests for advance commissions for policies whose premiums were never paid. Exhibit 9 demonstrated that Young had admitted to filling out an Oxford Life agent application in Gentry's name, writing Oxford Life policies in her name, and accepting commission payments from Oxford Life directed to Gentry. His wrongdoing with respect to Oxford Life is substantially similar to the offenses at issue in this case, and the incidents happened within a year or less of each other. We conclude the trial court properly determined Exhibit 9 was relevant to demonstrate identity. *See id.* (evidence of prior shooting by defendant was relevant to establish identity in shooting case at issue).

[32] As for the danger of unfair prejudice per Rule 403, the probative value of Exhibit 9 was very high given the similarities between Young's conduct against Oxford Life and his actions involving Fidelity Life. Young argues he was unfairly prejudiced because he did not have a chance to cross-examine the Oxford Life investigator. This argument carries little weight because he could have taken her deposition prior to trial or sought to have her testify. Young

further asserts he was unfairly prejudiced because the prosecutor repeatedly cited to the Oxford Life incident in his closing argument. This assertion is also without merit. The prosecutor referred to the facts mentioned in Exhibit 9 but limited his discussion to modus operandi, noting that with respect to Oxford Life and Fidelity Life, "basically the same thing was done." Tr. p. 429.

[33] Finally, the trial court read a limiting instruction to the jury, as follows:

> Ladies and gentlemen of the jury, this telephone conversation is coming in, but you are to limit how you accept this evidence. This telephone conversation deals with Oxford Life Insurance. Oxford Life Insurance is not the victim in this case. As we know and as we've heard, Fidelity Life Association is the victim. You may consider this evidence of this phone conversation for the limited purposes of finding preparation, plan, knowledge, identity, or absence of mistake. Those are the only purposes that you can consider this conversation.

*Id.* at 310. On appeal we presume the jury obeyed the court's instructions. *Isom v. State*, 31 N.E.3d 469, 481 (Ind. 2015). As a result, any prejudice from the admission of Exhibit 9 did not substantially outweigh its probative value, and the trial court did not abuse its discretion.

[34] Young also argues the admission of Exhibit 9 was erroneous because it amounted to a confession of wrongdoing without independent evidence of a *corpus delecti*. Young did not raise this argument in the trial court, so it is waived. *See Elvers v. State*, 22 N.E.3d 824, 832 (Ind. Ct. App. 2014) (failure to present issue to trial court results in procedural default of issue on appeal). Young further claims the admission of Exhibit 9 amounted to fundamental error. The *corpus delecti* rule, which states a crime may not be proven based

solely on a confession, "does not apply to evidence of other crimes permitted by Evidence Rule 404(b)." *Wilkes v. State*, 917 N.E.2d 675, 684 (Ind. 2010). As a result, there was no error, let alone fundamental error.

## III.  Jury Instructions

[35] Young argues the trial court erred in giving Preliminary Instruction 10 and Final Instruction 23, both of which instructed the jury that under the Constitution of Indiana, they had the right to determine "both the law and facts." Appellant's App. pp. 195, 251. Young claims these instructions violated Article I, section 10, clause 1 of the Constitution of the United States of America, commonly known as the ex post facto clause, because the jury could have "created" a new crime and determined Young was guilty. Appellant's Br. p. 39. The State responds that Young has failed to preserve any challenge to these instructions because he invited any error.

[36] We need not address the question of invited error because the transcript demonstrates Young unquestionably failed to object to the instructions. Failure to object in the trial court waives appellate review of a claimed error. *Kingery v. State*, 659 N.E.2d 490, 494 (Ind. 1996).

[37] Young mentions in passing that a challenge to jury instructions may be reviewed on appeal despite waiver if the error amounts to fundamental error. Young offers no analysis or citation to authority to demonstrate that the challenged instructions were so unduly prejudicial as to make a fair trial impossible. As a result, this claim is also waived. *See Absher v. State*, 866

N.E.2d 350, 355 (Ind. Cr. App. 2007) (claim of fundamental error waived if the appellant fails to present cogent argument or citation to authority).

## IV. Sufficiency of the Evidence

[38] Young asserts there is insufficient evidence to support each of his three convictions. He challenges his conviction for insurance fraud in the context of the denial of his motion for directed verdict. We will review his insurance fraud claim as a challenge to the sufficiency of the evidence because if the evidence is sufficient to sustain a conviction on appeal, then the denial of a motion for directed verdict cannot be error. *Hollowell v. State*, 707 N.E.2d 1014, 1019 (Ind. Ct. App. 1999). The State claims there is ample evidence to support the convictions.

[39] On a challenge to the sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Anderson v. State*, 37 N.E.3d 972, 973 (Ind. Ct. App. 2015), *trans. denied*. Instead, we respect the jury's exclusive province to weigh conflicting evidence. *Id.* As a result, we consider only the evidence most favorable to the verdict. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Scott v. State*, 867 N.E.2d 690, 694 (Ind. Ct. App. 2007), *trans. denied*. It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Dumes v. State*, 23 N.E.3d 798, 802 (Ind. Ct. App. 2014).

## 1. *Forgery*

In order to convict Young of forgery as a Class C felony, the State was required to prove beyond a reasonable doubt that: (1) Young (2) with the intent to defraud (3) made or uttered (4) a written instrument (5) in such a manner that it purported to have been made (6) by another person. Ind. Code § 35-43-5-2.

Young claims he did not make or utter the false application that was submitted to Fidelity Life in Gentry's name requesting her appointment as an independent agent. The evidence most favorable to the judgment reveals Young had access to Gentry's personal information because she had applied for life insurance through Liberty Insurance. In addition, Young had previously obtained general agent status with Oxford Life using Gentry's name, which is relevant to show the identity of the person who forged the application with Fidelity Life. Finally, Young admitted to a Fidelity Life investigator that he had "created a debt" for Gentry "without her approval or consent." State's Ex. 11. This is sufficient evidence from which the jury could have reasonably determined Young forged the application.

Next, Young asserts there is no evidence he had the requisite intent to defraud. An intent to defraud involves an intent to deceive and thereby work a reliance and an injury. *Diallo v. State*, 928 N.E.2d 250, 252 (Ind. Ct. App. 2010). There must be a potential benefit to the forger or potential injury to the defrauded party. *Id.* at 253.

The record establishes that Young, who had surrendered his insurance agent license to the Indiana Department of Insurance, began an agency relationship with Fidelity Life in Gentry's name, and he knew he did not have her "approval or consent." State's Ex. 11. Gentry had a valid insurance agent license. The jury could reasonably extrapolate from this evidence that Young intended to fool Fidelity Life into believing it had established a relationship with Gentry, with the plan of receiving commissions from Fidelity Life for selling its policies. This is ample evidence of intent to defraud. Young's arguments to the contrary are merely requests to reweigh the evidence, which our standard of review forbids.

### 2. Insurance Fraud

In order to convict Young of insurance fraud as a Class C felony, the State was required to prove beyond a reasonable doubt that: (1) Young (2) knowingly and with intent to defraud (3) caused a statement containing false, incomplete or misleading information (4) to be presented to an insurer (5) and caused economic loss in an amount exceeding $2,500. Ind. Code § 35-43-5-4.5.

Young claims the State failed to prove he caused any economic loss. The trial court instructed the jury that it was required to find that Gentry sustained the loss. Young conceded he had "created a debt" in Gentry's name. State's Ex. 11. As a result, Fidelity Life placed Gentry on Vector, an insurance industry blacklist "that pretty much paralyzes you." Tr. p. 222. If you are put on the list, "you can't do business." *Id.* At one point, Gentry told Young she "hadn't been able to work for almost 3 month[s]." State's Ex. 6. A jury could

reasonably infer from this evidence that Gentry had experienced lost income and other costs greater than $2,500 as a result of Young filing false claims with Fidelity Life.

[46] Next, Young argues the State failed to present sufficient evidence of any intent to defraud. He admitted to Fidelity Life's investigator that he wrote policies submitted to Fidelity Life in Gentry's name, and advance commissions were "effectively, paid to [him]." State's Ex. 11. Further, Young admitted that what he did was "wrong doing" for which he needed to make restitution. *Id.* The jury could have reasonably concluded from this evidence Young's goal was to deceive Fidelity Life into paying undeserved, inappropriate advance commissions to him. As a result, there is sufficient evidence of his intent to defraud, and Young's conviction for insurance fraud stands.

### 3. Theft

[47] In order to convict Young of theft as a Class D felony, the State was required to prove beyond a reasonable doubt that: (1) Young (2) knowingly or intentionally (3) exerted unauthorized control (4) over the property of another person (5) with intent to deprive the other person of any part of its value or use. Ind. Code § 35-43-4-2.

[48] Young argues there is insufficient evidence that he, rather than Liberty Insurance, took unearned money from Fidelity Life. The record reflects that Young admitted to writing Fidelity Life insurance policies in Gentry's name. Further, Fidelity Life's records demonstrate that advance payments on

commissions were paid to Edward A. Young. This is ample evidence from which the jury could have reasonably determined beyond a reasonable doubt that Young exerted unauthorized control over Fidelity Life's commission payments by writing insurance policies for which the premiums were not paid. As a result, there is sufficient evidence to sustain Young's theft conviction.

# Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

Najam, J., and Pyle, J., concur.